IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONWEST RESOURCES, INC., a Nevada Corporation,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>PLAYTIME NOVELTIES, INC., d/b/a EROSTAR EROTIC NOVELTIES, a Pennsylvania Corporation; and THOMAS SHERWOOD, an individual, citizen of U.S.A.,<br><br>　　　　　Defendants.<br>　　　　　　　　　　　　　　　　　／ | No. C 06-5304 SBA<br><br>**ORDER** |

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction [Docket No. 4]. After considering the parties' filings and the arguments presented at the hearing on November 14, 2006, the Court hereby DENIES the Motion for Preliminary Injunction.[1]

## **BACKGROUND**

Plaintiff ConWest Resources, Inc. is primarily in the business of producing adult entertainment, including adult novelty items. Montgomery Decl. at ¶¶ 2, 4. Plaintiff owns copyrights on twelve "sculptures" of male genitalia. Compl. at ¶ 14. Plaintiff also owns two trademarks for FALCON Plus Design novelty items. Compl. at ¶ 15.

In May 2001, ConWest entered into a Master Licensing Agreement with Mayday LLC, which gave Mayday the exclusive right to manufacture, market, distribute and sell the sculptures, and certain other adult novelty items referred to as "accessories," for five years. Mayday agreed to

---

[1] The Court also considered Defendants' objections to Plaintiff's evidence [Docket No. 31], and issued an oral ruling that each of these objections was SUSTAINED. Accordingly, the Court has not considered any of the evidence objected to in deciding the Motion for Preliminary Injunction. Further, the Court held that Defendants' late-filed declarations and objections to evidence [Docket Nos. 49-52] were STRICKEN. The Court has not considered those declarations or objections.

pay ConWest a royalty of $4 for each sculpture sold, and a royalty of 10% of the wholesale price for each accessory sold. Plaintiff's Ex. 1 (Agreement at ¶ 6). The Master Licensing Agreement included a provision entitled "Rights and Obligations Upon Termination," which states, in relevant part:

> Inventory: Licensor shall have the right, but shall not be obligated, to purchase the Sculptures, molds, boxes and other packaging items, and all Accessories and their packaging from the Licensee to the full extent of Licensee's inventory thereof. . . . Licensor shall complete all such purchases within 30 days of the written Notice of Termination. Upon expiration of the 30-day period, Licensee shall have the right to sell any remaining inventory in its possession during the six (6) month period following expiration of the 30 day period provided that Licensee continues to make the payments required under paragraph 6 above. At the expiration of Licensee's six (6) month period, Licensor has the right to buy any and all remaining inventory at the direct cost of manufacture.
> Agreement at ¶ 31(c).

The Master Licensing Agreement was assigned in 2003 to Defendant Playtime Novelties, Inc. d/b/a Erostar Erotic Novelties. Sherwood Decl. at ¶ 2. Defendant Thomas Sherwood is the President of Playtime. *Id.* at ¶ 1.

The Master Licensing Agreement appears to have been modified three times. The first Addendum was executed in May 2005, and provided that the Agreement would terminate on August 1, 2005, and that Erostar would have the right to distribute its remaining inventory of sculptures and accessories until January 1, 2006 within the United States only. Plaintiff's Ex. 2. The second Addendum was executed in September 2005, and provided, among other things, that the outstanding balance of royalties due to ConWest would be reconciled to zero. The minimum monthly royalty payments were reduced, and Erostar agreed to pay an advance final royalty payment. ConWest agreed to pay $300 for each sculpture mold returned, and ConWest was permitted to continue to purchase inventory from Erostar until December 31, 2005.[2] Sherwood Decl. Ex. D. The final

---

[2] Plaintiff disputes the validity of the second addendum. Montgomery asserts that Sherwood told him that certain terms in the proposed addendum were unacceptable, and that continued negotiations resulted in the addendum signed by Montgomery on October 26, 2005 and by Sherwood on November 2, 2005. Supplemental Montgomery Decl. at ¶ 6. According to Montgomery, "the parties never reached a meeting of the minds as to the September proposed addendum and the copy of that document attached to Mr. Sherwood's declaration is the only one that I have ever seen bearing his signature. Moreover,

1 Addendum was executed in November 2005, and provided that all outstanding balances would be
2 reconciled to zero, that Erostar would return all molds by December 19, 2005, and that "[t]he
3 licensing rights granted to Eurostar [sic] by ConWest under the Master Licensing Agreement shall
4 cease in their entirety on January 1, 2006." *Id*. Ex. E.

5       Early in 2006, Plaintiff made changes to its products and packaging, and entered into a new
6 distribution and licensing agreement with Pulse Distributors LLC. However, the President and CEO
7 of ConWest, Todd Montgomery, states that a senior manager at Playtime, Michael Johnson,
8 admitted that Playtime had continued to distribute ConWest's adult novelties after termination of the
9 license. Montgomery Decl. at ¶ 17. On April 28, 2006, ConWest's General Counsel sent a cease
10 and desist letter to Sherwood. *Id*. at ¶ 18. Montgomery states that Sherwood assured him "that the
11 unauthorized and infringing conduct had ceased." *Id*. at ¶ 19. Montgomery states that a second
12 cease and desist letter was sent to Defendants on July 26, 2006. Supplemental Montgomery Decl. at
13 ¶ 12.

14       Sherwood declares that Playtime discontinued manufacture of the sculptures in May 2005,
15 and that Playtime sold its entire inventory to Anything Distributors, Inc. ("ADI") in August 2005.
16 Sherwood Decl. at ¶¶ 8-9. According to Sherwood, all royalties due from this sale were reduced to
17 zero by the Addendums to the Agreement. *Id*. at ¶ 10. In May 2006, ADI and Playtime merged, and
18 Playtime once again became owner of the inventory of sculptures and accessories.[3] *Id*. at ¶¶ 21-22.
19 Sherwood further states that ConWest agreed to repurchase Playtime's remaining inventory, but
20 reneged on the deal in March 2006. *Id*. at ¶ 9. However, ConWest continued to purchase sculptures
21 from Playtime through April 2006. Further, ConWest allegedly contacted Playtime and requested
22 that they sell sculptures and accessories that were the subject of the prior License Agreement to a
23 European distributor in February and March 2006. *Id*. at ¶¶ 16-18.

---

defendants never paid the 'advance royalty payment of $20,250.00' which was due 'no later than September 1, 2005' pursuant to the terms of the purported September addendum." *Id*.

[3] Defendants stated at the hearing that ADI merged into Playtime, and ADI no longer exists.

3

**United States District Court**
For the Northern District of California

Plaintiff disputes these allegations. According to Montgomery, ConWest had no knowledge of a sale of all of Playtime's inventory to ADI in August 2005, and no royalties were paid to ConWest on that transaction. Supplemental Montgomery Decl. at ¶ 5. Montgomery states that "[w]hen I agreed, as part of the October/November addendum, to reconcile to zero all defendants' outstanding royalty payments, I had no idea Playtime claimed to have sold to ADI its entire inventory of FALCON products two months earlier. Such a sale should have produced an enormous royalty payment consisting of $4.00 for each erotic sculpture sold and 10% of the sale price of each accessory. I would never have walked away from such a payment had I known of this alleged secret mass sale." *Id*. at ¶ 8. Further, ConWest denies that it reneged on a promise to repurchase Playtime's remaining inventory: although ConWest admits that there were talks of a repurchase in 2006, "no such talks occurred in 2005," and thus Playtime's assertion that the sale to ADI took place only after ConWest reneged on a promise to repurchase inventory is "simply false." *Id*. at ¶ 5. According to Montgomery, ConWest proposed to buy Defendants' remaining inventory in March 2006, but Defendants did not respond and no agreement was reached. *Id*. at ¶ 11.

In addition, ConWest denies that it instructed or authorized Defendants to sell any of their remaining sculpture inventory to the European distributor, CloneZone. *Id*. at ¶ 10. Montgomery states that he instructed Mr. Johnson of Erostar to refer CloneZone directly to ConWest for the sale. *Id*. Plaintiff denies having consented to any sales of FALCON brand products by Defendants after the termination of the Master Licensing Agreement. *Id*. at ¶ 12.

Plaintiff filed a Complaint on August 29, 2006, alleging copyright infringement, trademark infringement, false designation of origin and unfair competition. A First Amended Complaint (FAC) was filed on October 24, 2006.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65 permits the issuance of a preliminary injunction to preserve the positions of the parties until a trial on the merits can be conducted. *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1158 (9th Cir. 2006) (citing *University of Texas v. Camenisch*,

4

451 U.S. 390, 395 (1981)).  A party seeking a preliminary injunction must show either: "(1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in [its favor]." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839-40 (9th Cir. 2001).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998).

Under the sliding scale theory, a party seeking an injunction "need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation."  *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993).  "Serious questions" are those which are "substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation."  *Senate of State of Cal. v. Mosbacher*, 968 F.2d 974, 977-78 (9th Cir. 1992) (citing *Gilder v. PGA Tour, Inc.*, 936 F. 2d 417, 422 (9th Cir. 1991)); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo."). Although the serious questions posed by the movant "need not promise a certainty of success, nor even a probability of success," he must nevertheless demonstrate a "fair chance of success" on the merits.  *Gilder*, 936 F.2d at 422; *see also Senate of California v. Mosbacher*, 968 F.2d 974, 977 (9th Cir. 1992).

Finally, under either of these tests, in cases where the public interest may be affected, the court must consider the public interest as a factor in balancing the hardships.  *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004) (citing *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992)).

## **ANALYSIS**

5

i.   Likelihood of Success on the Merits

**1. Copyright Claim**

To make a showing of copyright infringement, Plaintiff must prove (1) ownership of the copyrights, and (2) copying of an expression protected by those copyrights. *Triad Systems Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995).

a.   Validity of Copyrights

Defendants argue that Plaintiff has a poor likelihood of success on the merits because the copyrights at issue are invalid. Plaintiff has submitted the certificates of registration, which constitute prima facie evidence of the validity of the copyright. 17 U.S.C. § 410(c). *See also* Plaintiff's Exhibits 5-16. Thus, the burden is shifted to Defendants to prove the invalidity of the copyrights. *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997).

Defendants first argue that the purpose of the "sculptures" is utilitarian, and thus the copyrights are invalid. Utilitarian works are not protected under the Copyright Act: the statute protects "pictorial, graphic, and sculptural works," but the design of a "useful article" is only protected to the extent that "such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101. A "useful article" is defined as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." *Id*. *See also Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 893 (9th Cir. 1983) ("[I]f an article has *any* intrinsic utilitarian function, it can be denied copyright protection except to the extent that its artistic features can be identified separately and are capable of existing independently as a work of art.").

Courts have struggled with how to determine whether artistic features exist separately and independently from utilitarian function. A thorough discussion of the case law can be found in *Pivot Point International v. Charlene Products, Inc.*, 372 F.3d 913 (7th Cir. 2004). The court noted that

6

the following tests have been developed for determining whether artistic and utilitarian aspects of an article are conceptually separable: "(1) the artistic features are 'primary' and the utilitarian features 'subsidiary,' (2) the useful article 'would still be marketable to some significant segment of the community simply because of its aesthetic qualities,' (3) the article 'stimulate[s] in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function,' (4) the artistic design was not significantly influenced by functional considerations, (5) the artistic features 'can stand alone as a work of art traditionally conceived, and . . . the useful article in which it is embodied would be equally useful without it,' and (6) the artistic features are not utilitarian." *Id*. at 923 (citations omitted). The court ultimately adopted the tests developed by the Second Circuit in *Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2nd Cir. 1985), and *Brandir International, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142 (2nd Cir. 1987).

> Conceptual separability exists, therefore, when the artistic aspects of an article can be conceptualized as existing independently of their utilitarian function. This independence is necessarily informed by whether the design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences. If the elements do reflect the independent, artistic judgment of the designer, conceptual separability exists. Conversely, when the design of a useful article is as much the result of utilitarian pressures as aesthetic choices, the useful and aesthetic elements are not conceptually separable. *Id*. at 931 (citations omitted).

In *Barnhart*, the court held that mannequins of partial human torsos used to display clothing were utilitarian works not entitled to copyright protection. 773 F.2d at 418. In *Brandir*, the court held that a bicycle rack was a utilitarian object not entitled to copyright protection.

The "sculptures" at issue in this case are somewhat analogous to the mannequins in *Barnhart*, as they are reproductions of human body parts. It is clear that the objects have a utilitarian purpose. Plaintiff conceded at oral argument, and it was plainly evident from an examination of the objects, that they can be, and generally are, used for sexual gratification. The packaging of the product notes that it is dishwasher safe and compatible with various types of lubricants, strongly indicating that it is meant for use in sexual acts.

However, Plaintiff argues that there are features of the sculptures that are conceptually

separable from their utilitarian aspects. Plaintiff argues that the sculptures "are intended to stimulate in the mind of the beholder an appreciation of the inherent beauty and power of male sexuality." Pearson Decl. at ¶ 5. Plaintiff contends that the sculptures "are not sold solely for utilitarian purposes. ConWest has priced these erotic fantasy sculptures well above the range for purely utilitarian 'sex toys.'" *Id*. Plaintiff asserted at oral argument that the objects are tributes to certain models, and that collectors purchase them for display.

There are factual issues associated with the question of conceptual separability that require development through discovery. And, as noted, the burden is on Defendants to rebut the prima facie case of copyright validity. However, in the Court's view, it is likely that the sculptures at issue are utilitarian objects not entitled to copyright protection. Their design does appear to be inextricably intertwined with their utilitarian purpose. It is difficult to imagine how the sculptures' aesthetic features can be conceptually separated from their function: given that the function is to arouse, design features that are intended to stimulate in the mind of the beholder the concept of sexuality are not truly independent from the utilitarian purpose of the object. Accordingly, the Court holds that Plaintiff does not have a strong likelihood of success on the merits of validity of the copyrights.

Defendants also argue that the copyrights are invalid because the sculptures are not original creative works, because they are simple castings of the genitalia of actual men. They rely on *Satava v. Lowry*, 323 F.3d 805, 812-13 (9th Cir. 2003), in which the court held that lifelike glass-in-glass sculptures of jellyfish were not sufficiently original to warrant copyright protection. "We do not hold that realistic depictions of live animals cannot be protected by copyright . . . we recognize, however, that the scope of copyright protection in such works is narrow. . .  These ideas, first expressed by nature, are the common heritage of humankind, and no artist may use copyright law to prevent others from depicting them. An artist may, however, protect the original expression he or she contributes to these ideas." *Id*. Defendants argue that the treatment of sculptures of animals in their natural state should also apply to humans and human parts.

Plaintiff points out that the Copyright Examiner stated her belief that the "work contains

8

some additional sculptural authorship that may be regarded as copyrightable." Pearson Decl. at ¶ 2. Plaintiff asserts that its art department "makes numerous artistic changes and refinements in both the size and the aesthetic look of the initial casts in order to produce the erotic sculptures in question. The resulting erotic sculptures are not simple casts or slavish reproductions of body parts. They are the result of substantial creative and imaginative expression." *Id*. at ¶ 3. Defendants asserted at oral argument that the only differences from the original casts were size and color of the objects, which is insufficient to establish originality.

Again, there are unresolved factual questions material to this issue. Although the argument that the sculptures are not original creative works may have merit, Defendants have not provided sufficient evidence to rebut the presumption of validity of the copyrights as to this issue. Thus, the Court does not find that Plaintiff has a low likelihood of success on the merits with respect to the question of originality. However, because Defendants have persuaded the Court that the sculptures are most likely utilitarian objects, Plaintiff does not have a probability of success on the merits of the validity of the copyrights.

### b. Infringement

Plaintiff argues that infringement is established because it has valid copyrights, and Defendants have continued selling the copyrighted products after the termination of the license agreement. Defendants assert the "first sale doctrine" as a defense to infringement.

Under the Copyright Act, "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a). This is known as the first sale doctrine, and it "limits the right of a copyrighter to control disposition of a genuine copy after the first sale of that copy." *Disenos Artisticos E Industriales, S.A. v. Costco Wholesale Corp.*, 97 F.3d 377, 380 (9th Cir. 1996). Thus, the question here is whether there was a first sale of the sculptures at issue.

According to Defendants, the sculptures were sold to ADI on August 25, 2005. *See*

9

Sherwood Decl. at ¶¶ 9-10. The Master Licensing Agreement was then in effect, so the sale was authorized. Any royalties owed to Plaintiff by Defendants from this sale were cancelled by the September 6, 2005 Addendum to the Agreement. Playtime and ADI subsequently merged, so the sculptures were reacquired by Playtime. Defendants argue that any sales made thereafter were permissible because there had already been an authorized first sale. *See Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1150 (9th Cir. 1996). *See also Quality King Distributors, Inc. v. L'Anza Research International, Inc.*, 523 U.S. 135, 152 (1998) ("The whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution.").

Plaintiff vigorously contests this theory and version of events. According to Plaintiff, Playtime and ADI are, in actuality, one entity, and thus the sale by Playtime to ADI in August 2005 was a "sham sale by Sherwood to himself." Plaintiff asserts that Sherwood is or was the CEO, President, Secretary, and Treasurer of ADI, and that Playtime and ADI share the same office address. *See* Melton Decl. at ¶ 5; Sherwood Decl. Ex. D; Plaintiff's Ex. 19. Sherwood signed the document effectuating the merger of Playtime and ADI in May 2006 as the President of both companies. Sherwood Decl. Ex. L. Further, Plaintiff asserts that the sale from Playtime to ADI was never disclosed to ConWest, and no royalties were paid on the sale. Defendants counter that any royalties owed from the sale were zeroed out per the September addendum to the Master Licensing Agreement, and deny that the sale from Playtime to ADI was in any way improper. Plaintiff argues that the addendum was invalid, because Plaintiff was unaware of the sale of inventory from Playtime to ADI. Further, Plaintiff argues that the sale must have been a sham, because Playtime continued to make sales of the inventory supposedly sold to ADI: Defendant's own evidence shows that Playtime sold FALCON products after August 2005 (when it purportedly sold ADI its entire inventory) and before May 2006 (when Playtime and ADI merged and Playtime reacquired the inventory). *See* Sherwood Decl. Ex. L (showing sales by Playtime to ConWest, to CloneZone, and to third party purchasers whose names have been redacted between January and May 2006). Accordingly,

10

1 Plaintiff argues, the sale of Playtime's inventory to ADI does not constitute an authorized "first sale,"
2 and the first sale doctrine does not apply.

3 There may be some merit to Plaintiff's argument, but based on the evidence before it, the
4 Court cannot conclude that the August 2005 sale from ADI to Playtime was a "sham," or that ADI
5 and Playtime are actually one entity. "Piercing the corporate veil," and finding that corporations are
6 alter egos, as Plaintiff would have the Court do, is "the rare exception," and "the mere fact of sole
7 ownership and control does not eviscerate the separate corporate identity that is the foundation of
8 corporate law." *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir.
9 2004) (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)). Thus, the fact that (pre-
10 merger) both Playtime and ADI were owned and/or operated by Sherwood is not dispositive.
11 Likewise, there may be merit to ConWest's assertion that it would not have entered into the
12 addendum zeroing out royalty payments owed had it known about the sale. However, ConWest did
13 execute the addendums, which in addition to forgiving outstanding royalty payments owed by
14 Defendants to Plaintiff, also forgave sums owed by Plaintiff to Defendants. Thus, there was
15 apparently a sale for which Plaintiff received consideration. Accordingly, the Court holds that the
16 first sale doctrine is likely to apply.

17 Defendants also argue that they had a contractual right to continue selling the sculptures. *See*
18 Opposition at 10. According to Defendants, the termination provision of the Master Licensing
19 Agreement gave them the right to sell remaining inventory in their possession for six months after
20 the 30-day period in which Plaintiff had the right to purchase it – so they had the right to sell off
21 inventory until August 1, 2006. Plaintiff contends that the Addendums to the Agreement altered or
22 negated this provision. The first Addendum states that "Erostar will have the right to distribute its
23 remaining inventory of Sculptures and Accessories until January 1, 2006 within the United States
24 only." Plaintiff's Ex. 2. The Court expresses no opinion at this juncture about whether the contract,
25 including the addendums, was breached: all that is before the Court is the Motion for Preliminary
26 Injunction, and a preliminary injunction will not issue based on a breach of contract claim. *See*
27
28

11

1 *Telephia Inc. v. Cuppy*, 2005 WL 588441 at *3 (N.D. Cal. March 11, 2005) (Illston, J.) (holding that
2 "breach of contract can be compensated by money damages, and does not warrant the issuance of a
3 preliminary injunction").  To the extent that Plaintiff argues that the first sale doctrine should not
4 apply because Defendants breached the contract, the Court is unpersuaded by that argument.

Based on the foregoing, the Court holds that Plaintiff does not have a probability of success on the merits of its copyright claim: the sculptures are likely utilitarian articles not entitled to copyright protection, and the first sale doctrine is likely a meritorious defense to infringement.  Any contractual violations are not an appropriate basis for a preliminary injunction.

### 2. Trademark Claim

The Lanham Act imposes civil liability on those who, without the trademark owner's consent, use a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" in a manner that "is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114.  Plaintiff argues that Defendants have infringed the FALCON mark by continuing to sell Plaintiff's adult novelty products after the termination date of the Master Licensing Agreement.

The first sale doctrine also applies in the trademark context.  *See Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995) ("Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.").  Because, as discussed, the first sale doctrine is likely to apply to the copyright claim, it is also likely to apply to Plaintiff's trademark claim.

Further, Defendants argue that the goods were genuine, and therefore their sale cannot constitute trademark infringement.  *See NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987) ("Trademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent.").  This rule is in some tension with cases cited by Plaintiff specifically dealing with unauthorized use of a mark by a former licensee.  *See Paisa, Inc. v. N&G Auto, Inc.*, 928 F. Supp. 1009, 1012-13 (C.D. Cal. 1996) (holding that, where a former licensee continues to use a mark without authorization, that constitutes

12

trademark infringement because it "creates a likelihood of confusion for the public, and invariably threatens injury to the economic value of the goodwill and reputation associated with [the] mark") (citing *Church of Scientology Int'l v. Elmira Mission of Church of Scientology*, 794 F.2d 38, 44 (2nd Cir. 1986)). However, *Paisa* is distinguishable from this case: there, the plaintiff operated a system of automotive service shops using the mark "Purrfect Auto Service" in the shape of a cat. The defendant was a former franchisee who continued to use signs bearing the mark. Thus, the public was led to believe that the shop was a franchisee of Paisa, even though it was not. Here, Defendants allegedly continue to sell products which bear Plaintiff's mark – the difference is that they are, in fact, Plaintiff's products. Plaintiff does not contend that Defendants have changed or repackaged the products in any way. *See Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083 (9th Cir. 1998) (recognizing exceptions to first sale doctrine where products have been repackaged or fail to meet trademark holder's quality control standards). Thus, *NEC Electronics, supra,* and the first sale doctrine cases control; Plaintiff has not shown a strong likelihood of success on its trademark infringement claim.

Defendants again argue in the trademark context that they have a contractual right to sell off remaining inventory. As discussed above, even if Defendants breached the contract, a preliminary injunction will not issue on that basis, so the Court makes no determination as to whether the contract was breached.

Finally, Defendants argue that their use of the FALCON trademark in the advertisement flyer was nominative fair use, not infringement. The nominative fair use doctrine recognizes that "it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark." *New Kids on the Block v. News America Publishing Inc.*, 971 F.2d 302, 306 (9th Cir. 1992). There are three requirements for the nominative fair use defense: "(1) the product must not be readily identifiable without use of the mark; (2) only so much of the mark may be used as is reasonably necessary to identify the product; and (3) the user must do nothing that would, in conjunction with the mark, suggest sponsorship or

13

1 endorsement by the trademark holder." *Horphang Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1041
2 (9th Cir. 2003).  Defendants claim that the sculptures are unmarketable without the use of the mark,
3 and that they did not claim sponsorship or endorsement or refer to the license; "Playtime simply
4 advertised a product for sale and took added efforts to protect the ConWest mark by attaching the ®
5 symbol to the FALCON® mark on the ad."  Opposition at 15.  Plaintiff makes a conclusory
6 statement that the nominative fair use defense has no application, but offers no argument in support.
7 Reply at 15.  The Court need not resolve this question: Plaintiff's First Amended Complaint does not
8 accuse Defendants of using its mark in advertising.  The substance of the trademark infringement
9 claim is that Defendants are continuing to sell Plaintiff's products bearing the FALCON mark,
10 despite the termination of the license agreement.  Suffice to say that if Plaintiff has not shown a
11 likelihood of success on its claim that Defendants are infringing the trademark by selling the
12 sculptures, Plaintiff is unlikely to prevail on a claim that Defendants are infringing the trademark by
13 advertising the sculptures.

14 Accordingly, Plaintiff has not shown a strong likelihood of success on the merits of its
15 trademark infringement claim.

16     ii.    <u>Irreparable Harm</u>

17 In a copyright case, "[a] showing of a reasonable likelihood of success on the merits raises a
18 presumption of irreparable harm."  *Triad Systems*, 64 F.3d at 1335.  Likewise, in trademark
19 infringement cases, once the plaintiff has established a likelihood of confusion, "it is ordinarily
20 presumed that the plaintiff will suffer irreparable harm."  *Vision Sports, Inc. v. Melville Corp.*, 888
21 F.2d 609, 612 n.3 (9th Cir. 1989).  *See also Church of Scientology*, 794 F.2d at 43 (holding that "in a
22 licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are
23 more compelling than in the ordinary case.  When in the licensing context unlawful use and
24 consumer confusion have been demonstrated, a finding of irreparable harm is automatic").

25 Plaintiff offers essentially no argument with respect to harm, simply stating that because it
26 has demonstrated copyright and trademark infringement, it is entitled to a preliminary injunction.

14

1 Motion at 11-14.  At oral argument, Plaintiff asserted that the fact that Defendants are continuing to
2 sell the products is impairing its ability (and that of its new licensee) to sell the products, and
3 misleading consumers.

4 Defendants argue that Plaintiff should be estopped from claiming that it will suffer
5 irreparable harm, because it deliberately induced Playtime to commit the alleged copyright and
6 trademark infringement: ConWest made purchases from Playtime of sculptures and accessories after
7 January 1, 2006, and instructed Playtime to continue marketing the sculptures in Europe, thus
8 leading Defendants to believe that they were authorized to sell such items.  Opposition at 16-17.  As
9 discussed, Plaintiffs strongly contest this version of the facts.  Defendants also argue that Plaintiff
10 has acted in bad faith, and the Court should not grant injunctive relief to a party with "unclean
11 hands."  Again, this claim is based on facts that are strongly disputed.  Finally, Defendants argue
12 that the injunction should not issue because the harm to Playtime if an injunction is issued will far
13 outweigh the harm to ConWest if an injunction is denied.  Defendants argue that issuance of an
14 injunction will irreparably harm Mr. Sherwood's reputation.

15 In the Court's view, neither party has made a persuasive showing that the balance of
16 hardships tips in their favor.  If the preliminary injunction issues, Defendants will lose money
17 because they will be unable to sell an apparently substantial inventory of sculptures, and the
18 reputation of Mr. Sherwood will allegedly be damaged.  If the preliminary injunction does not issue,
19 Plaintiff will lose money because it will be less able to sell its products in a market that is allegedly
20 saturated.  The Court is unpersuaded that consumers will be misled, because as discussed, the
21 sculptures at issue are not "knock-offs," they are genuine FALCON products.

22 Plaintiff has not demonstrated a probability of success on the merits, and preliminary
23 injunction is a "drastic and extraordinary remedy that is not to be routinely granted."  *RasterOps v.*
24 *Radius, Inc.*, 861 F. Supp. 1479, 1482 (N.D. Cal. 1994) (citing *Intel Corp. v. ULSI System*
25 *Technology, Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993)).

## **CONCLUSION**

15

1    Accordingly, IT IS HEREBY ORDERED THAT Plaintiff's Motion for Preliminary
2 Injunction [Docket No. 4] is DENIED.
3    IT IS FURTHER ORDERED THAT Defendants' Evidentiary Objections [Docket No. 31]
4 are SUSTAINED.  IT IS FURTHER ORDERED THAT Defendants' late-filed declarations and
5 objections [Docket Nos. 49-52] are STRICKEN.
6    IT IS FURTHER ORDERED THAT a Case Management Conference shall be held on
7 December 19, 2006, immediately following the hearing on Defendant's Motion to Dismiss or
8 Transfer.
9    IT IS SO ORDERED.

Dated: 11/17/06

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge

16